IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF VIRGINIA
Alexandria Division

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | ) | |
| | ) | |
| v. | ) | Case No. 1:12-cr-258 |
| | ) | |
| KAIXIANG ZHU, | ) | |
| | ) | |
| Defendant. | ) | |
| | ) | |

**MEMORANDUM OPINION**

At issue in this immigration fraud prosecution is defendant's motion to dismiss the indictment on the ground that the government deported a witness whose testimony, defendant contends, would have been material and favorable to defendant's case. Following full briefing and oral argument, an Order issued denying defendant's motion.[1] This Memorandum Opinion records and elucidates this ruling.

**I.[2]**

This case arises from a series of sting operations in which undercover government agents posed as individuals offering to sell fraudulent green cards to aliens. On June 1, 2011, two individuals, Chang Yun Hui, a 62-year old Chinese acupuncturist who spoke no English, and Shu Hong Zhao, met with undercover Immigration and Customs Enforcement ("ICE") agents at the Hyatt Dulles hotel in a room wired by ICE. A Chinese-speaking undercover agent served as

---

[1] *United States v. Kaixiang Zhu, et al.*, No. 1:12cr258 (E.D. Va. Apr. 24, 2015) (Doc. 476) (Order).

[2] The facts recited here are derived chiefly from the parties' briefs and from Agent Cindy Yang's Affidavit in support of the criminal complaint.

a translator during this meeting.  At this meeting, the two individuals discussed purchasing unlawful and fraudulent permanent resident alien cards from the undercover agents.  There was an audio and video recording of this meeting, which has been made available to defendant.  In the course of the meeting, Hui and Zhao discussed the price at which the undercover agents would sell them the fraudulent permanent resident cards so that Hui and Zhao could, in turn, sell the cards to their alien customers.  In effect, Hui and Zhao were operating as brokers in this fraudulent green card scheme.

During the June 1, 2011 meeting, Hui submitted to the undercover agents a handwritten list of potential customers who were interested in purchasing unlawful and fraudulent permanent resident cards.  One of the individuals listed was the defendant Kaixiang Zhu, who originally entered the United States in 2001 on an exchange-visitor visa and was no longer legally present in the United States.  Hui's handwritten list also included Zhu's brother-in-law, Ming Hui Lu, and Zhu's relative, Qiao Chan Zhang.  During this June 1, 2011 meeting, Hui also submitted to the undercover agents three Form I-485s for Zhu, Lu, and Zhang along with copies of each individual alien's Chinese passport.  Zhu signed his I-485 form and dated it March 14, 2011, certifying that "under penalty of perjury under the laws of the United States of America . . . the information provided with this application is all true and correct."  It is undisputed that large sections of Zhu's I-485 form were left blank, including how Zhu was entitled to a green card (Part 2) and how Zhu entered the United States (Part 3).  Additionally, the government contends that Zhu inaccurately represented both his employment status and his residence on his I-485 form.

On June 16, 2011, Hui met with the undercover agents at a Homewood Suites in Herndon, Virginia and submitted a list of 10 alien customers who wanted permanent resident

cards. This list contained many of the same names as the list of individuals Hui submitted during the June 1, 2011 meeting, including Zhu's name. In the course of the meeting, which was also recorded and made available to Zhu, Hui assured the undercover agents that he would not discuss the scheme with anyone except his partner, Zhao.

Thereafter, on August 25, 2011, Hui brought 16 customers to meet with the undercover agents at the Crystal City Hilton in Arlington, Virginia in order to take the alien customers' fingerprints, collect their signatures and photographs, and collect completed Form I-485s to begin the process of creating fraudulent permanent resident cards. As agreed upon in advance, Hui brought a translator to this meeting, who also happened to be one of Hui's customers and is a co-defendant in this case. Upon arriving at the Crystal City Hilton, Hui's customers went up to the designated hotel room in groups of four. The hotel room was wired by ICE for audio and video recording and Hui was present during all four of the customer meetings. According to the Department of Homeland Security Investigation report, Hui stated that he advised one group of his customers that the undercover agents' method of obtaining the green cards was legal, but Zhu was not a part of this group. At the beginning of the August 25, 2011 meeting, the undercover agents showed each group of alien customers a permanent resident card and explained, via the translator, that the customers would receive real permanent resident cards, but they would be obtaining these cards illegally. The undercover agents also warned all four groups of customers that they could go to jail for obtaining their permanent resident cards in this manner, and cautioned the customers not to contact their immigration offices or travel outside the United States for one year to avoid attracting attention.

Particularly pertinent to this case, the undercover agents specifically told the second group of customers—which included Zhu—that the hotel room was not an immigration office

3

and that the permanent resident cards were acquired by dealings with "dangerous individuals." At the end of each group's meeting on August 25, the undercover agents took a full set of fingerprints from each customer, including Zhu. Also, each customer placed his or her right index fingerprint and signature on a Form I-89 data collection form. Upon the completion of the fingerprinting process, the undercover agents advised Hui that they would email Hui about the prices of the cards, because the price of some of the cards would be higher than others.

On January 26, 2012, Hui met with undercover agents at his residence in Flushing, New York. At this meeting, Hui stated that his alien customers were growing impatient and wanted to obtain their permanent resident cards as quickly as possible. Thereafter, on June 13, 2012, many of the co-defendants were arrested and taken into custody when they traveled to the Eastern District of Virginia to take possession of green cards in their names. Importantly, however, Zhu did not accompany this group to the Eastern District of Virginia, and instead remained at-large. When ICE agents went to arrest Zhu in New York using the address he provided in his I-485 form, Zhu was not there and no one at the location knew Zhu, including a ten-year resident in the building who had never seen Zhu.

24 persons, including Zhu, were named in the indictment that issued on June 14, 2012. A number of these persons, including Zhu, were not arraigned at that time as they were fugitives. The indictment charged Zhu with one count of conspiracy to commit immigration fraud and one count of fraud and misuse of immigration documents. One year later, on June 25, 2013, Hui was deported pursuant to a removal order. Zhu eluded capture until December 30, 2014 when, while responding to a call reporting threats being made in a Chinese restaurant, police took Zhu into custody in Rogers, Arkansas, seventeen miles away from where Zhu's brother-in-law, Lu, was

4

arrested for speeding on August 21, 2014. Both Zhu and Lu provided their respective arresting

officers with the same address, namely a residence in Bentonville, Arkansas.

## II.

The removal or deportation of a material witness has occasioned considerable litigation by

defendants claiming that they were denied a fair trial by virtue of a loss of a witness material to

their cases. The leading case on the issue is the Supreme Court's decision in *United States v.*

*Valenzuela-Bernal*, 458 U.S. 858, 873 (1982), which held that the deportation of a material

witness may deprive a criminal defendant of his or her constitutional right to a fair trial.

Importantly, however, the Supreme Court was clear that the deportation of a witness is not a *per*

*se* constitutional violation; rather,

> [s]anctions may be imposed on the Government for deporting witnesses *only* if
> the criminal defendant makes a plausible showing that the testimony of the
> deported witnesses would have been material and favorable to his defense, in
> ways not merely cumulative to the testimony of available witnesses.

*Id.* (emphasis added). And "[a]s in other cases concerning the loss of material evidence,

sanctions will be warranted for deportation of alien witnesses only if there is a reasonable

likelihood that the testimony could have affected the judgment of the trier of fact." *Id.* at 873-74.

In striking the balance between deference to the Executive Branch in the implementation of

immigration laws on the one hand and affording constitutional protections to criminal defendants

on the other, the Supreme Court concluded that the "responsibility of the Executive Branch

faithfully to execute the immigration policy adopted by Congress justifies the prompt deportation

of illegal-alien witnesses upon the Executive's good-faith determination that they possess no

evidence favorable to the defendant in a criminal prosecution." *Id.* at 872.

In the wake of *Valenzuela-Bernal*, the majority of federal courts of appeals to address this

issue have interpreted *Valenzuela-Bernal* as imposing two requirements on a criminal defendant

seeking to show a constitutional violation based on the deportation of a claimed material witness: "[f]irst, the defendant must show that the government acted in bad faith . . . [s]econd, the defendant must demonstrate that deportation of the witness prejudiced his case." *United States v. Leal-Del Carmen*, 697 F.3d 964, 969-70 (9th Cir. 2012); *see also United States v. Damra*, 621 F.3d 474, 489-90 (6th Cir. 2010) ("[I]n order to demonstrate that the government has violated his right of compulsory process, a defendant must first make an initial showing that the government has acted in bad faith, and having made that showing, must then make some plausible showing that the testimony of the deported witness would have been both material and favorable to his defense."); *United States v. Chaparro-Alcantara*, 226 F.3d 616, 624 (7th Cir. 2000) (same); *United States v. Iribe-Perez*, 129 F.3d 1167, 1173 (10th Cir. 1997) (same).[3]

Importantly, the Fourth Circuit, unlike the Sixth, Seventh, Ninth, and Tenth Circuits, has not explicitly adopted the requirement that a criminal defendant must show bad faith on the part of the government in order to prevail on a claim that the government violated the defendant's constitutional rights by deporting a material witness. Instead, the Fourth Circuit's succinct summarization of *Valenzuela-Bernal* suggests precisely the opposite view. In *United States v. Moussaoui*, 382 F.3d 453, 475 (4th Cir. 2004), the Fourth Circuit noted that the "[Supreme] Court nevertheless held that the Government's *good faith* deportation of the potential witnesses

---

[3] Courts that have incorporated the bad faith prong into the analysis under *Valenzuela-Bernal* have relied on two principal justifications. The first is the "Court's statement in *Valenzuela-Bernal* that 'the responsibility of the Executive Branch faithfully to execute the immigration policy adopted by Congress justifies the prompt deportation of illegal-alien witnesses upon the Executive's *good-faith* determination that they possess no evidence favorable to the defendant in a criminal prosecution." *United States v. Bresil*, 767 F.3d 124, 130 (1st Cir. 2014) (citing *Valenzuela-Bernal*, 458 U.S. at 872) (emphasis added). Second is the Supreme Court's decision in *Arizona v. Youngblood*, 488 U.S. 51 (1988), which held that "unless a criminal defendant can show *bad faith* on the part of the police, failure to preserve potentially useful evidence does not constitute a denial of due process of law." *Damra*, 621 F.3d at 489 (citing *Youngblood*, 488 U.S. at 58).

would be sanctionable if the witnesses were material to the defense." *Id.* (emphasis added). A reasonable reading of *Moussaoui*, then, is that the Fourth Circuit interpreted *Valenzuela-Bernal* as allowing for the imposition of sanctions even if the government acted in good faith. A recent decision from this district confirmed that the Fourth Circuit has yet to follow the lead of its sister circuits and definitively adopt the bad faith component, commenting "[w]hether the Fourth Circuit would recognize a bad faith requirement need not be prognosticated here." *United States v. Bran*, 950 F. Supp. 2d 863, 872 (E.D. Va. 2013). Here too, it is unnecessary to prognosticate whether the Fourth Circuit recognizes a bad faith requirement.[4] Instead, the relevant test for the alleged violation in this case is drawn directly from *Valenzuela-Bernal*. First, the defendant must show that the "testimony of the deported witnesses would have been material . . . to his defense, in ways not merely cumulative to the testimony of available witnesses." *Valenzuela-Bernal*, 458 U.S. at 873. And the Supreme Court is clear that the materiality inquiry "must be evaluated in the context of the entire record." *Id.* at 868. Second, the defendant must show that the testimony of the deported witness is favorable to his defense; that is, that "there is a reasonable likelihood that the testimony could have affected the judgment of the trier of fact." *Id.* at 874. It remains to apply this standard to the facts of this case.

---

[4] Although Zhu is not required to show bad faith on the part of the government, it is worth noting that there is not a scintilla of evidence in this record that the government acted in bad faith in deporting Hui. Indeed, any complaint about the government's deportation of Hui before Zhu was charged and had the opportunity to interview Hui can be traced to Zhu's decision to flee and remain at-large for almost two years. Accepting Zhu's argument on this point would mean that the government would have to detain individuals like Hui for indeterminate periods simply because these individuals have some connection to pending cases involving criminal defendants, including those who are fugitives.

## III.

Zhu contends that the government's deportation of Hui constitutes a constitutional violation because Hui would testify that he told his customers, including Zhu, that the process of obtaining green cards was legal, and this testimony is both material and favorable to Zhu's case. Zhu's argument, which distilled to its essence is that Hui's testimony demonstrates Zhu's lack of criminal intent, stems almost exclusively from the following excerpt from the relevant Department of Homeland Security Investigation:

> According to HUI, the aforementioned individuals went through HUI because they were friends introduced by "Julie." HUI stated that he advised the aforementioned individuals that "Andrew's" way of obtaining the green cards was *legal* and that the green cards are "real" green cards.

Defendant's Exhibit 1, Department of Homeland Security Investigation at 5 (emphasis added).

Zhu's reliance on this excerpt from the Department of Homeland Security Investigation to establish the materiality and favorability of Hui's testimony is meritless and fails for three independent reasons: (i) the statement in the Department of Homeland Security Investigation was not made to *this* particular defendant; (ii) Hui's testimony as to Zhu's criminal intent or lack thereof would be cumulative to the testimony of other available witnesses on this issue; and (iii) in any event, when evaluated against the entire record, Hui's testimony would not be material or favorable because the record contains numerous indicia of Zhu's understanding and awareness that the green card process was illegal.

First, and most importantly, Zhu glosses over the fact that Hui's statement that the process was legal was made to the "aforementioned individuals." According to the report, these individuals were: (1) Jin Zheng; (2) Chunhui Hong; (3) Minghui Lu; and (4) Ah Ling. Notably, and particularly pertinent to this case, Zhu's name does *not* appear in this listing. Since Zhu is not included as one of the "aforementioned individuals," defense counsel is assuming without

8

record support that Hui made similar statements to *all* of the relevant customers, instead of just the enumerated individuals in this report. Because this assumption has no basis in the record, the claim that Hui "would have offered exculpatory testimony is speculative at best." *United States v. Williams*, 468 F. App'x 343, 345-46 (4th Cir. 2012).

Second, the government correctly points out that Hui's testimony on Zhu's criminal intent or lack thereof would be "cumulative to the testimony of available witnesses." *Valenzuela-Bernal*, 458 U.S. at 873. Specifically, accepting Zhu's contention as true—that he believed the green card process was legal—Hui is far from the only individual who could offer probative testimony on this issue. Indeed, as the government notes, Zhu's brother-in-law, Lu, is another witness who was present when Hui spoke to Zhu's group, and thus Lu could testify on whether Hui made any statement to Zhu's group concerning the legality of the cards and the process by which they were being obtained. Defense counsel concedes this point in its reply brief: "[a]fter all, not only Mr. Zhu, but Mr. Zhu's brother-in-law, also believed and trusted Dr. Hui . . . Lu reiterated that Dr. Hui had said the green cards were going to come from the federal government through 'amnesty' because those cards were more available."[5] Lu accompanied Zhu to Virginia for the August 25, 2011 meeting and was with Zhu when Zhu's fingerprints were submitted. Moreover, approximately two years after the applications were submitted, Lu and Zhu were living together. Accordingly, the government is correct that Lu is another witness who had knowledge about Hui's statements to Zhu's group with respect to the legality of the green card process.[6]

---

[5] Defendant's Reply Brief at 3.

[6] It is worth noting that Lu is currently detained and awaiting removal to China. Yet Zhu, in the meantime, has not served a trial subpoena on Lu, nor has Zhu attempted to halt Lu's deportation

Nor is Lu the only witness who could testify on this subject. Indeed, apart from Lu, *any* of Hui's 16 customers—especially the four individuals mentioned by name in the Department of Homeland Security Investigation report—that traveled with and interacted with Zhu could testify that all of the customers trusted Hui and thought the green card process was legal. Zhu further contends that if the jury heard directly from Hui himself about his representations to Zhu, the jury would be provided with a sufficiently detailed explanation as to what Zhu believed regarding the green card scheme. While this may be true, it is insufficient to make Hui's missing testimony material because the pertinent question is whether the substance of Hui's testimony is cumulative to the testimony of available witnesses. Here, it is clear that this question must be answered in the affirmative.

Third, when "evaluated in the context of the entire record," as the Supreme Court requires, Hui's testimony would not be material. *Valenzuela-Bernal*, 458 U.S. at 868. This is so because the record is littered with facts persuasively underscoring Zhu's understanding that the green card process was illegal. Indeed, Zhu's I-485 form contains a number of false statements, including his address and his employment status, and incomplete representations, including how Zhu entered the United States and why Zhu's status entitled him to a green card. In addition, it is undisputed that at the August 25, 2011 meeting, Zhu was present when the undercover agents explained that Zhu and the other customers could go to jail for obtaining the green cards as part of the scheme. Even after this warning, Zhu still submitted his fingerprints and his I-485 form.

---

proceedings in any way. *See* 18 U.S.C. § 3144 ("If it appears from an affidavit filed by a party that the testimony of a person is material in a criminal proceeding, and if it is shown that it may become impracticable to secure the presence of the person by subpoena, a judicial officer may order the arrest of the person . . . .").

In other words, the record is replete with evidence that Zhu fully understood that his actions were illegal.

In response, Zhu contends that he believed he was going to a governmental office on August 25, and once it became clear that the destination was a hotel room, not a government office, he only submitted his paperwork because he felt pressured to do so. This argument fails a basic smile test. To begin with, Zhu was traveling with a group of three other aliens, two of whom were his relatives, so any argument of implied coercion is undermined by Zhu's familiarity with the other aliens in his customer group. Moreover, even after realizing that the process was taking place in a hotel room and not in a government office, Zhu still submitted his paperwork and fingerprints and did not protest or take any action during the August 25, 2011 meeting indicating he did not want to procure his green card. Zhu also asserts that because Hui gave Zhu the I-485 form, the blank spaces and inaccurate information on the form could be attributable to Hui. This argument also fails; Zhu signed his I-485 form, and thus the incompletions and misrepresentations are his. Thus, when evaluated against the entire record, Hui's alleged statement that he told Zhu the green card process was legal is not material because Zhu's actions prior to and during the August 25, 2011 meeting indicate that he fully comprehended the illegality of his actions.

Given the state of this record, Zhu also cannot establish that Hui's testimony would be favorable and that "there is a reasonable likelihood that the testimony could have affected the judgment of the trier of fact." *Valenzuela-Bernal*, 458 U.S. at 874. Indeed, the fact that there are a number of persons who were present when Hui allegedly made the statement on which Zhu attempts to rely in his motion coupled with Zhu's other incriminating actions during the application process point persuasively to the opposite conclusion: it is unlikely that Hui's

11

testimony could plausibly affect the judgment of the trier of fact.  *See id.*  In sum, evidence of

Zhu's knowledge that the green card process was illegal is compelling, including:

> (1) Zhu's signed I-485 form containing incomplete sections and misrepresentations;
>
> (2) Zhu's decision to continue with the green card procurement process even after realizing the process was occurring in a hotel room, instead of a government office; and
>
> (3) Zhu's submission of paperwork and fingerprints *after* being warned of the illegality of the green card process.

## IV.

Even if Zhu were correct that Hui's testimony is both material and favorable to his

defense, which Zhu has fallen short of demonstrating on this record, dismissal of the indictment

is an inappropriate and unduly harsh sanction.  The Fourth Circuit is clear that the "dismissal of

an indictment altogether clearly thwarts the public's interest in the enforcement of its criminal

laws in an even more profound and lasting way than the requirement of a retrial."  *United States*

*v. Derrick*, 163 F.3d 799, 807 (4th Cir. 1998).  As a result, "courts that have found that the

deportation of a material witness violated the defendant's rights have consistently concluded that

the missing witness instruction is the appropriate sanction."  *Bran*, 950 F. Supp. 2d at 875.  This

sanction accords with the decision in *Valenzuela-Bernal*, where the Supreme Court noted that

"[b]ecause determinations of materiality are often best made in light of all the evidence adduced

at trial, judges may wish to defer ruling on motions until after the presentation of evidence."  458

U.S. at 874.  Thus, even if Zhu's constitutional rights were violated by the deportation of Hui—

which is not supported on this record—an appropriate sanction might well be, at most, an

instruction to the jury as concerning Hui's absence.  Whether any sanction at all is warrant must

await development of the record at trial.  Dismissal of the indictment, at this early stage of the

proceedings, is not warranted based on this record.

## V.

In sum, defendant's motion to dismiss the indictment must be denied.

An appropriate Order has already issued.

Alexandria, VA
May 11, 2015

T. S. Ellis, III
United States District Judge